UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff<br><br>v.<br><br>ALEXANDER BURNHAM<br><br>Defendant | Docket # 2:20-cr-00061-GZS |

### DEFENDANT'S SENTENCING MEMORANDUM

NOW COMES the Defendant, ALEXANDER BURNHAM, by and through Zerillo Law Firm, LLC, and respectfully submits his Sentencing Memorandum for consideration by the Court.

**I.      OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT**

On January 4, 2021, by and through Undersigned Counsel, Mr. Alexander Burnham (hereinafter "Alex") filed his objections to Probation Officer Jennifer Metcalfe's Presentencing Investigation Report (which was later revised, hereinafter "Revised PSIR"). Alex specifically objected to *Page 5, Paragraph 10, Page 6, Paragraph 13,* and *Page 7, Paragraph 19* of the Revised PSIR. After careful consideration and further research, Alex withdraws all of his remaining objections.

**II.     FACTUAL BACKGROUND**

**A.     Introduction**

Alex was arrested on April 21, 2020, and has been incarcerated at Cumberland County Jail (hereinafter "CCJ") since that time.

Alex is a 22 year-old native of Maine. He pled guilty to the two counts of the Indictment in this matter, and he has fully accepted responsibility for his unlawful conduct. In addition, Alex has expressed genuine remorse for his wrongdoing.

In the following paragraphs, we will discuss a number of mitigating factors which we believe are relevant. These factors, when considered individually and in combination with each other, justify the imposition of a sentence of 41 months of incarceration. Since almost all of this information has been verified in the Revised PSIR, we will simply highlight or summarize certain points which support our position.

**B.      Personal and Family Background**

Alex was born in 1998 in Portland, Maine. Alex's father was not present for his birth. His mother was 16 years-old at the time.

Sadly, for the majority of his childhood he was raised by his mother. Alex has almost no memory of his father. He only met his father on one occasion, when he was just six-years old. Under those circumstances, Alex never developed a relationship with his father. Alex has never had the benefit of having a father who served as a positive role model. The only male role model in his life was his grandfather, William Huntley.

Until he was six months old Alex lived with his mother and his grandmother, Sharon Shepard. His mother was 16 years-old and was unable to care for him without the help from his grandmother.

When he was about six months old his mother moved out and lived with her boyfriend, leaving Alex with his grandmother. During this time Alex was primarily raised by his grandmother.

When Alex was about two years old he moved in with his mother, her boyfriend, and his two younger step-sisters. This was a hostile environment and a very rough time for Alex. His mother's boyfriend was physically and emotionally abusive to both his mother and Alex. He would slap, punch, and throw his mother against the wall. The abuse of his mother scared Alex. Alex would go into the other room to investigate and protect his mother. For his efforts he would receive a slap in the face by his mother's boyfriend.

Alex's mother worked various jobs for long hours during the day. She would come home and be so tired that it was difficult for her to take care of Alex. As a result, Alex was raised by his mother's abusive boyfriend for much of his early development.

Alex refused to go to Kindergarten. He argued that he wanted to spend time with his mother, and not be under the supervision of her boyfriend. As a result, Alex missed a lot of his early schooling and had to repeat Kindergarten.

The family dealt with overwhelming financial pressures during this time. Living with his mother's boyfriend kept the family off the street, but it also ensured that their apartments were consistently located in high-crime neighborhoods. Alex' mother was on food stamps and it was often difficult for them to find food.

In the summer of 2004, when Alex was six, he moved in with his grandfather, William Huntley, in Westbrook, Maine. Alex lived with his grandfather for a year. Alex's grandfather was the first real father figure he knew. This year was the happiest time of his childhood. When Alex was not in school, his grandfather would take him fishing and swimming at the local pool. His grandfather also taught him how to ride a bike.

After one year of living with his grandfather, Alex moved back in with his mother, her boyfriend, and two younger sisters in Portland. His mother had secured stable housing by this

time and could take Alex back in.  Unfortunately, Alex found himself back in the same abusive household he was happy to leave.  During this period Alex and family moved around the Portland area approximately five times.  The cycle of physical and emotional abuse that Alex and his mother suffered continued.  Eventually, when Alex was seven or eight years old, his mother's boyfriend moved to Texas.

When his mother's boyfriend moved to Texas, it left Alex, his mother, and his two younger sisters to fend for themselves.  This enhanced both the financial and childcare strain on the struggling family.  Not only did Alex have to deal with his own childhood issues, he had to be a father figure to his two younger sisters.  While he had limited guidance himself in those areas, Alex tried his best to support his sisters.  Alex's daily routine consisted of waking his younger sisters up in the morning, making sure that they ate breakfast, and that they were on time for school.  Alex did this from the ages of 11 to 13.  He found this emotionally draining and difficult.  However, he wanted to help his mother as much as he could.  Alex found stress relief from his duties outside of the home by hanging out with friends.

Alex attended Portland High School.  Alex thoroughly enjoyed school.  In his freshman year he had passing grades and went to all of his classes.  Alex also enjoyed playing on the basketball team and dreamed of one day playing in college.

Sadly, Alex's grandfather passed away on December 5, 2016, while Alex was in his sophomore year of high school.  This was devastating to Alex.  After his grandfather passed, Alex's life spiraled out of control.  Alex stopped going to school, stopped obeying rules at home, started smoking marijuana, and began getting into trouble.

Around the time of his grandfather's passing, Alex's mother and his sisters moved to Biddeford. Alex did not want to live in Biddeford, and instead chose to live with friends in Portland.

Alex's friends made a largely negative impact on him. Alex stopped regularly going to school his sophomore year and barely passed that year. Alex dropped out of high school after his sophomore year. This was when his substance abuse issues, as described below, began in earnest.

One of the more positive aspects of Alex's life is his relationship with his family and his community.[1] Alex spends time during the week calling and writing to his family. Unfortunately, due to the CCJ lockdowns he has been unable to video conference with his family. His family has been unable to visit him. Alex has not seen any of his family members in ten months. This has been profoundly difficult on him given his tight relationship with his mother, sisters, and grandmother.

Alex's relationship with his mother is very important to him. The Revised PSIR notes that his mother suffers from multiple health issues, including hidradenitis suppurativa (an autoimmune disease) and diabetes. Alex's mother has expressed concern that, due to her health issues, she fears she may not survive while he is in custody. This would be devastating for Alex.

Alex also has a strong relationship with his grandmother. He calls her and writes letters to her at least once per week.

When Alex was initially incarcerated on State charges, a petition was started on change.org in an effort to help amend his bail conditions.[2] As of this date over 1,300 people have signed the petition. It is clear that Alex has significant support from his community.

---

[1] Character reference letters will be submitted to this Court pursuant to Local Rule 132(g).
[2] Grant Bail for Alex due to his severe health issues: https://www.change.org/p/probation-grant-bail-for-alex-due-to-severe-health-issues?redirect=false

After Alex is released from federal custody he plans on living in New Jersey with his cousin, Kaylee, a social worker. Prior to incarceration Alex was in barber school through Spa Tech Institute.[3] He hopes to one day open his own barber shop. Alex acknowledges that relocating with his cousin could set him up for greater post-custody success as he could "start fresh" and get away from negative influences in Maine. Notably, Alex's mother echoed this plan, relaying confidence that she will be a good role model for Alex.

### C. Age of the Defendant

As indicated in paragraph 74 of the Revised PSIR, Alex's age at the time he committed this offense is a factor which warrants consideration by the Court. Alex was only 22 years old when he committed the instant offense. As noted in the report, there is a growing body of both case law and neuroscience research indicating that individuals under the age of 25 do not possess their full reasoning skills or abilities. Further, there is evidence that the use of alcohol or marijuana at a young age causes delays in the development of the brain. As described below, Alex began using marijuana and drinking alcohol during his teenage years.

### D. Alcohol and Drug Use

Alex began smoking marijuana in high school. He has been a daily user for the last five years. At the time of his last arrest Alex was smoking between an eighth and a quarter of an ounce per day.

Alex also reported that he was an "on and off" user of alcohol. He would drink to excess several days in a row, abstain for a long period of time, and cycle through terms of excessive drinking and complete abstinence.

---

[3] Proof of enrollment and a progress report from Spa Tech Institute will be submitted to this Court pursuant to Local Rule 132(g).

When Alex's grandfather passed away a friend offered him Xanax to help cope with the loss. The Xanax helped him manage his alcohol use. Alex began using Xanax heavily, first starting off with a daily use of one "bar" and he remembers becoming "lost in it," using two to three bars per day.[4] In late 2017, until early 2018, Alex was able to manage his Xanax use, and ceased using it.

In early 2018, Alex began using oxycodone to help quit his Xanax addiction. He initially used ten-milligram oxycodone pills once daily. Alex built up to 30-40 milligrams daily until the time of his most recent arrest.

Between 2016 and 2020, Alex regularly used powder cocaine. Alex has also experimented with other drugs, such as mushrooms and "molly" (also known as ecstasy or MDMA).

Alex has never had formal substance abuse treatment. He recalled attending Narcotics Anonymous meetings while in jail a few years ago. Alex indicated that he is interested in being referred for structured treatment to treat his substance abuse issues. He acknowledges that he has a substance abuse problem "bigger than [he] care[s] to admit." Alex acknowledges that his substance abuse has contributed to his choice of social influences and criminal history and is concerned these will "make it tough for [him] to confidently 'be something.'"

As of this date Alex is waiting to be transferred to the Strafford County Drug Treatment Program in New Hampshire. Alex understands that the drug treatment program will help him. He wants to make every effort in treating his substance abuse.

E.   **Gunshot Wound**

---

[4] Each Xanax "bar" has 2 milligrams per dose.an entire Xanax bar, which can create irritability, aggression, and hyperactive behavior.
https://www.addictioncenter.com/benzodiazepines/xanax/xanax-bars/#:~:text=Each%20Xanax%20bar%20has%202, which%20is%20the%20smallest%20dose.

On April 7, 2020, Alex was shot in the leg. The trajectory of the bullet went vertically down the back of his upper calf and lodged into his ankle. Alex was immediately rushed to the hospital.

The bullet wound resulted in six surgeries to remove the bullet and repair the damaged tissue. For approximately one week Alex had a hole in his ankle that was approximately six to seven centimeters in diameter. The doctors were able to successfully stitch the hole back up.

For two months Alex had to hobble around on crutches. As a result of being shot in the leg, Alex is going to need a significant amount of physical therapy in order for him to properly walk again. Alex has built up a lot of scar tissue in the location of his gunshot wound. Unfortunately, he is unable to receive physical therapy while at CCJ. As a result, he has taken physical therapy into his own hands. Alex can stand and walk on his leg for about an hour and a half until it gets too painful. Too much stress on his leg will cause the tissue to break and his leg will bleed. It is likely that Alex will need future surgery to repair the scar tissue. Alex's wound and leg pain are a daily reminder of the mistakes he has made.

**F.     Mental Health History**

On December 4, 2013, Alex was involved in a serious car accident which caused him a concussion. As a result of the accident and the gunshot wound, Alex reports self-diagnosed post-traumatic stress disorder (PTSD). As a result of the PTSD he reports that loud sounds are triggering for him and he suffers from night-sweats and insomnia.

When Alex was 19 years old he received a medical marijuana card through Maine Wellness of Portland, Maine, to help treat his PTSD symptoms.

Alex has never sought, nor received, mental health counseling or treatment. Alex's mother is confident he suffers from depression and "tries to hide it." Alex's mother reported that he has been treated with depression medication while in custody at CCJ.

### G. Offense Conduct

On April 7, 2020, Alex, arrived with a friend at Central Street in Westbrook. As he was getting out of the passenger seat in his friend's vehicle he accidentally shot himself with a loaded Smith & Wesson 9mm semi-automatic. Alex's friend sped to Brighton Medical Center (hereinafter "Brighton"), located at 335 Brighton Ave in Portland, with Alex bleeding in the passenger seat. While on the way to Brighton, Alex tossed the firearm and two brown paper bags out the passenger car window.

Due to the degree of trauma to his leg, Alex was transferred from Brighton to Maine Medical Center in Portland, Maine. Doctors at Maine Medical Center observed powder burns on Alex's right leg. After x-rays, the doctors learned that there was a bullet lodged in his ankle. The gunshot wound was determined to be self-inflicted and Alex would have been standing when it occurred. Alex had multiple surgeries to remove the bullet and close the wound.

The firearm and two paper bags were retrieved by Westbrook Police Officers the next day. The contents of the two paper bags were laboratory tested. It was determined that the two bags contained cocaine base, alprazolam, fentanyl, and oxycodone.

Over the past two years, Alex has watched his life deteriorate from substance abuse and mental health issues. His grandfather's passing and lack of father figure sent Alex into a downward spiral. He no longer had his grandfather's support that he so heavily relied on.

### H. The Coronavirus Has Diminished Alex's Ability to Make His Time at Cumberland County Jail Productive

Due to the coronavirus pandemic, CCJ, and other jails across the State of Maine, have been largely on lockdown. Alex wishes to address his substance abuse issue. He is currently unable to do so due to the lack of, and delay of entry into, Bureau of Prison programs. Alex is currently on a waitlist for the drug treatment program in Strafford County.

Despite the lockdowns at CCJ that Alex has endured, he has been active and keeping busy as much as he can. At CCJ there is a basketball hoop which Alex enjoys using to get exercise. Alex also enjoys lifting weights and walking laps around the workout area to strengthen his damaged leg.

### III.   ARGUMENT

#### A.   Sentencing Framework

This Court well understands the 18 U.S.C. § 3553(a) factors used in determining and imposing sentences that are "sufficient, but not greater than necessary" to achieve the penological objectives of the criminal justice system. *United States v. Booker*, 543 U.S. 220 (2005), see also *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("the Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable") (italics in original). Sentencing judges therefore "have discretion to select an appropriate sentence, and in doing so are statutorily bound to consider the factors listed in § 3553(a), including the advisory Guidelines range." *United States v. Cavera*, 550 F. 3d 180, 188 (2d Cir. 2008) (*en banc*). This Court is empowered to consider its "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F. 3d 191, 195 (2nd Cir. 2006). See also *United States v. Bartlett*, 567 F. 3d 901, 908 (7th Cir. 2009) ("a judge need not accept the Sentencing Commission's penological framework. The court may adopt its own").

In crafting the sentence, this Court is to start with the advisory guideline range, and then move on to a determination of the Section 3553(a) factors. *Gall v. United States.*, 552 U.S. 38 (2007); *United States v. Martin*, 520 F. 3d 87, 91 (1st Cir. 2008). A sentencing judge may reject the Guideline range on the basis of a policy disagreement with the Guidelines. *United States. v. Spears*, 129 S.Ct. 840, 844 (2009); *United States v. Boardman*, 528 F. 3d 86, 87 (lst Cir. 2008); *United States v. Rodriguez*, 527 F. 3d 221, 231 (lst Cir. 2008) ("sentencing courts possess sufficient discretion under section 3553(a) to consider requests for variant sentences premised on disagreements with the manner in which the sentencing guidelines operate..."). *Gall* directs courts to look to the procedural soundness and substantive reasonableness of the sentence. *United States v. Thurston*, 544 F. 3d 22, 24-25 (1st Cir. 2008), citing *Gall*, 128 S.Ct. at 597, and *Martin*, 520 F.3d at 92.

### B. The Guideline Calculation

Alex does not dispute the Guideline Calculation made on *Page 17, Paragraph 58* of the Revised PSIR. The following calculations are applicable to Alex's sentence:

| Guideline Provision | Description | Offense Level |
|---|---|---|
| USSG §2D1.1 | Base Offense Level | 24 |
| USSG §2D1.1(b)(1) | Specific Offense Characteristics | +2 |
| USSG §3E1.1(a), (b) | Acceptance of Responsibility | -3 |
| | Total Offense Level | 23 |
| | Criminal History Category V | Guideline Range: 84-105 months |

There are significant mitigating factors that call for a variance from the guideline range calculated by the Revised PSIR. There are no mandatory minimums in this case.

### C. Mitigating Factors Affecting the Sentence

In general, this Court should consider factors in mitigation that affect the sentencing guidelines. These factors include, but are not limited to, the nature and circumstances of the offense, the history and characteristics of the Defendant, the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the Defendant, to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, and the need to avoid unwarranted sentencing disparities. *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (*en banc*). This Court should consider other mitigating factors such as poverty, drug abuse and addiction, dysfunctional family background, lack of guidance as a youth, etc.

    i.  *Alex was Physically Abused as a Child by his Mother's Boyfriend*

Abuse suffered during childhood, which – at some level of severity – can impair a person's mental and emotional conditions. District courts may properly grant a downward departure on the ground that extreme childhood abuse caused mental and emotional conditions that contributed to the Defendant's commission of the offense. *United States v. Rivera*, 192 F.3d 81, 84 (2d Cir. 1999). The court can consider the Defendant's troubled upbringing and his exposure to domestic violence as a child. *United States. v. Lopez*, 938 F.2d 1293, 1298 (D.C.Cir. 1991); see *United States v. Deigert*, 916 F.2d 916, 918-19 (4th Cir. 1990); see *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (evidence about the Defendant's background is relevant because of the belief "long held by this society, that the Defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems may be less culpable than Defendants who have no such excuse.").

As described above, Alex had a troubling childhood and was subjected to cycles of both physical and emotional abuse. For years, Alex and his mother were abused by Alex's mother's boyfriend. This past physical and emotional abuse has affected him to the present and has significantly impacted his upbringing.

      ii.     *Alex Shot Himself*

In *United States v. Clough*, the Ninth Circuit determined that the district court has discretion to downward depart in firearms cases where the Defendant was shot by police during arrest because his "significant injuries" constitutes a continuing form of punishment and factor not considered and not forbidden by the guidelines. 360 F.3d 967 (9th Cir. 2004).

While Alex was not shot by the police, he did accidentally shoot himself. If Alex had not received immediate medical assistance he could have bled to death. As a result of the gunshot wound and multiple surgeries, Alex has suffered a significant amount of pain not endured by most people. There is no doubt that Alex's actions have made a profound impact on his physical health. He is living with a reminder of his actions every time he takes a step.

      iii.     *Alex is Going to Need Significant Physical Therapy*

U.S.S.G. § 5H1.4 makes "physical appearance including physique" not "ordinarily" relevant, but may be so in unusual cases. Section 5H1.4 provides that "an extraordinary physical impairment may be a reason to impose a sentence below the guideline range."

In *United States v. Johnson*, the Judge reviewed 500 pages of medical records and concluded that imprisonment posed a substantial risk to Defendant's life. 71 F.3d 539, 545 (6th Cir. 1995). While the *Johnson* Court considered a Bureau of Prison letter stating that they could take care of any medical issues, the Court determined that it was merely a form letter "trumpeting BOP capability." *Id*.

In *United States v. Streat*, the Sixth Circuit remanded the case to the District Court observing that the Court has discretion to depart from the sentencing guidelines because of Defendant's extraordinary physical impairment. 22 F.3d 109, 112-13 (6th Cir. 1994).

There is no doubt that Alex's physical impairment is extraordinary. Lengthy incarceration could be incredibly detrimental to Alex's future ability to walk without being hindered. As previously described, Alex is going to need a significant amount of physical therapy if he wants to gain 100% strength of his leg, if that is even possible. The Bureau of Prisons does not provide Alex, and other inmates, physical therapy.

      *iv.*    *Delay in Sentencing and Refusal to Release Defendant from State Charges Resulted in Alex Earning "Dead Time"*

On or about April 22, 2020, the Cumberland County District Attorney's Office (hereinafter DA's Office") filed two Motions to Revoke Alex's probation. At around the same time the DA's Office filed a five count Complaint against Alex based on the events from this instant case.

On or about June 3, 2020, the United States Attorney's Office filed criminal charges against Alex.

At his Initial Appearance in the United States District Court, United States Magistrate Judge John H. Rich III ordered that a federal conditional detainer be entered, whereby if the DA's Office released the probation revocation holds, and released Alex from State custody, he would immediately be released to Federal custody and could begin receiving credit for pretrial detention time served.

Subsequently, on July 9, 2020, the DA's Office dismissed the charges against him. At this time, the DA's Office was aware of the "springing" detention Order issued by this Court. Despite this, they refused to release the probation revocation holds. This resulted in Alex still

14

being held on State charges.  During this period of time, Alex was earning "dead time," which he generally could not receive pretrial credit for time served for his Federal sentencing.

The DA's Office finally released the hold on or about October 9, 2020, and Alex was immediately released to Federal custody.

From June, 2020, to October, 2020, Alex earned approximately four months of "dead time" that he could generally not get credit for.  This loss of pretrial detention time should earn Alex a reduction in his overall sentence of incarceration.

> v.   *Videoconference Plea and Sentencing*

Alex is aware of the backlog of cases caused by the pandemic.  Due to this backlog, the Government has offered a three-level variance for Defendants who plead and are sentenced by video during the period of restricted operations by the Maine District Court.  Alex pleaded guilty on October 1, 2020.  Subsequently, Alex filed a request to proceed to sentencing *via* video.  The Government has not offered the video sentencing variance to Alex.  However, it is the Court that ultimately makes the decision whether a variance is appropriate.

Section 3553(a) states that "courts shall consider a variety of factors when imposing a sentence, including: . . . (6) the need to avoid unwarranted sentencing disparities among similarly-situated defendants." *United States v. Bryant*, Crim. No. 95-202-CCB-3, 2020 WL 2085471, at *4 (D. Md. Apr. 30, 2020).  Alex is similarly situated to other defendants who received the video sentencing variance because they share the basis for the by agreeing to appear for plea and sentencing by video. *See United States v. Smith*, Crim. No. 07-3038-LTS, fn. 25 (commenting that defendants were similarly situated based on era of conviction, not the specific convictions).  The U.S. Attorney's picking and choosing who gets a variance and who does not

creates an unwarranted sentencing disparity between similarly situated defendants who pleaded guilty and/or were sentenced *via* video.

> vi. *Defendant's Health Condition Warrants an Earlier Release*

In *United States v. Martin*, the Court determined that several serious medical conditions were present that made the Defendant's health exceptionally fragile. 363 F.3d 25, 50 (1st Cir. 2004). The Court was not convinced that the Bureau of Prisons could adequately provide for the Defendant's medical needs during an extended prison term. *Id*. The Court found that there was a high probability that lengthy incarceration will shorten the Defendant's life span. *Id*.

As described below, Alex suffers from a severe case of asthma. Should Alex contract the coronavirus it may be a death sentence. The Bureau of Prisons has utterly failed to control the spread of coronavirus. Prisons are "powder kegs for infection" that have allowed "the COVID-19 virus to spread with uncommon and frightening speed." *United States v. Rountree*, 2020 WL 2610923, at *5 (N.D.N.Y. May 18, 2020); see also *United States v. Young*, 2020 WL 2514673, at *2 (D. Mass. May 15, 2020) ("the virus can appear suddenly and spread quickly in the prison population").

In July, 2020, the American Medical Association (hereinafter "AMA") confirmed that "COVID-19 case rates have been substantially higher and escalate much more rapidly in prisons than in the US population." The AMA's findings give us a telling chart on the rate of coronavirus infection in prisons versus the wider population. There is no dispute that prisons are vastly more dangerous. *B. Saloner, Ph.D., et al., Covid-19 Cases and Deaths in Federal & State Prisons, J. Am. Med. Assoc.* (July 8, 2020).

Federal Courts across the nation have considered the potential impact of the coronavirus pandemic when determining sentencing of incarceration.

In Oregon, in *United States v. Sandoval*, Chief Judge Marco Hernandez varied downward from 12 months prison, to three years' probation with eight months house arrest, for two defendants stating that he sentenced both defendants to prison and was only varying to probation not because of counsel's arguments but "because of the pandemic." 3:18-cr-00449-HZ (D. Oregon, March 12, 2020).

In the Southern District of New York, in *United States v. Park*, the Court feared that leaving the Defendant any longer at FCI Danbury may convert a three-year prison sentence into a death sentence, which is something "the Court cannot allow." 2020 WL 1970603, at *6 (S.D.N.Y., April 24, 2020). The Court considered the nature of prisons, and determined that the conditions – crowded, with shared sleeping spaces and common areas, and the prisoners' limited access to medical assistance and hygienic products – put those incarcerated inside a facility with an outbreak at heightened risk.

In Michigan, in *United States v. Watkins*, the Court reduced the sentence to time served of a 34 year old defendant serving 10 years for distribution of drugs because "latent tuberculosis" constituted compelling reasons to reduce sentence in light of coronavirus pandemic. 2020 WL 4016097 (ED Mich. July 16, 2020).

Alex was born seven weeks prematurely, which resulted in long-term lung issues, including severe asthma and susceptibility to pneumonia. Alex's medical conditions put him at a serious risk of contracting a severe case of coronavirus.

Alex was three years-old when he was rushed to the emergency department because he stopped breathing and his face turned blue. He was diagnosed with severe asthma. This diagnosis greatly impacted his life.

When Alex was eleven or twelve years-old he spent two weeks at the Barbara Bush

17

Children's hospital because he could not breathe on his own for ten minutes without a respirator. On average, Alex has two to three emergency room visits per year as a result of him catching the cold. Each emergency room visit lasts from at least one day to two to three weeks.

Due to his asthma, the CDC classifies Alex at a high risk for having a severe case of coronavirus.[5] Inmates at CCJ are unable to take the necessary precautions to prevent the spread of coronavirus (washing hands, staying home, keeping six feet away from others, cleaning and disinfecting surfaces, etc.). Long term confinement at the bureau of prisons with his medical conditions makes Alex considerably more susceptible to disease or death than the typical defendant the Court sentences.

V.   **CONCLUSION AND REQUESTED SENTENCE**

In summary, we believe there are multiple mitigating factors in Alex's background which, when considered in combination with each other, warrant a variant sentence.

Specifically, those factors are: Alex's difficult childhood which included being the product of a broken home; financial distress; the fact that Alex was raised by his mother, who suffered from a variety of serious health problems; the fact Alex never had a positive male role model in his life because his father left when he was just an infant; Alex's positive long-term relationship with his half-sisters, and his willingness to act as a father to them; the fact that Alex was only twenty-two years old when he committed this offense, which is an age where his reasoning skills and abilities are not fully developed; the physical and emotional abuse Alex suffered as a child; Alex's recent mental health history, namely a PTSD diagnosis; and his physical health issues.

For all of these reasons, we ask the Court to impose a sentence of 41 months of incarceration.

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

Dated this 2nd day of March, 2021 in Portland, Maine.

                                              Respectfully Submitted,
                                              ZERILLO LAW FIRM, LLC


                                              /s/ Stephen M. Sweatt, Bar No. 6270
                                              Attorney for Alexander Burnham
                                              1250 Forest Ave, Suite 3A
                                              Portland, ME 04103
                                              207.228.1139
                                              *stephen@zerillolaw.com*

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff<br><br>v.<br><br>ALEXANDER BURNHAM<br><br>Defendant | **Docket # 2:20-cr-00061-GZS** |

**CERTIFICATE OF SERVICE**

I, Stephen Sweatt, hereby certify that I have caused to be served *via* ECF the **DEFENDANT'S SENTENCING MEMORANDUM** to all counsel of record.

Dated this 2nd day of March, 2021 in Portland, Maine.

                                              Respectfully Submitted,
                                              ZERILLO LAW FIRM, LLC


                                              /s/ Stephen M. Sweatt, Bar No. 6270
                                              Attorney for Alexander Burnham
                                              1250 Forest Avenue, Ste 3A
                                              Portland, ME 04103
                                              207.228.1139
                                              *stephen@zerillolaw.com*